UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THERMO FISHER SCIENTIFIC INC., <br>     Plaintiff, <br> v. <br><br> KENNETH BERGER, <br>     Defendant. | Case No. 1:12-cv-11070-RGS <br><br> **DECLARATION OF** <br> **KENNETH BERGER** |

KENNETH BERGER, being duly sworn, states as follows:

1. I am the defendant in the above-captioned action. I respectfully submit this declaration (the "Declaration") in support of my Motion to Dismiss Plaintiff Thermo Fisher Scientific Inc.'s ("Thermo" or "Plaintiff") Complaint (the "Complaint") for Lack of Personal Jurisdiction or to Transfer Venue. I have personal knowledge of the facts set forth herein, except where otherwise indicated.

2. I am currently the Chief Executive Officer of ConvaTec Inc. ("ConvaTec"), a Delaware corporation based in Skillman, New Jersey. ConvaTec is a medical technology development and marketing company that focuses primarily on Ostomy Care, Wound Therapeutics, Continence and Critical Care, and Infusion Devices.

3. I typically work Monday through Friday and spend a minimum of five nights per week in New Jersey, when I am not traveling on ConvaTec business. I am in the process of trying to sell my home in New Hampshire, at which time I intend to reside full-time in New Jersey.

4. I have never been a resident of Massachusetts, nor have I ever owned any property in Massachusetts.

1

5.  I have never worked in Massachusetts, nor have I ever paid any income tax in Massachusetts.

6.  ConvaTec has no offices and no employees in Massachusetts. I do not travel to Massachusetts on business for ConvaTec.

I.  **Employment with Thermo in California and China**

7.  In 2001, I was hired by Thermo Electron Corporation ("Thermo Electron"), a predecessor to Plaintiff, as the President of the Real Time Analytics Business (the "RTA Business"). The RTA Business is located in San Diego, California, where I worked during my tenure in the RTA Business. I was a resident of California during that entire time.

8.  In 2005, I was promoted to the position of President of Thermo-China, located in Shanghai, where I worked until 2006. I maintained my residency in California while I worked in China.

9.  In 2006, I returned to California and was promoted to the position of President of the Process Instruments Department (the "PI Department"), which was located in San Diego, California. The PI Department did not have any offices or employees in Massachusetts. I continued to reside in California during my tenure in the PI Department.

10. In 2006, Thermo Electron merged with Fisher Scientific International, Inc. (the "Merger") and formed Thermo Fisher Scientific Inc. Following the Merger, I remained employed as President of the PI Department in California, where I continued to reside and work.

11. In 2008, I was promoted to the position of President of the Biosciences Division, which was also located in San Diego, California. I remained a California resident and worked in California during my tenure in the Biosciences Division.

12. As President of the Biosciences Division, I reported directly to Alan Malus, my then-Group President, who was based in Thermo's Pittsburgh, Pennsylvania office. The Biosciences Division had a number of other offices around the world, but did not have any offices or employees in Massachusetts.

13. The RTA Business, PI Department, Thermo-China and the Biosciences Division were all entirely self-contained business units and did not utilize the resources of Thermo's Massachusetts office. Thermo's information technology services, pricing management, marketing, and payroll were all centralized in the Pittsburgh office.

14. The Complaint alleges that I traveled to Massachusetts for "various meetings and trainings" during my employment at Thermo, which is misleading. During my employment in Thermo's California and China offices, I typically was required to travel to Massachusetts no more than once per quarter, to participate in status update meetings with Thermo's Chief Executive Officer. At those meetings, I provided updates to the CEO on the performance of my division and received general feedback on that performance. To the best of my recollection, I did not receive specific direction or assignments from the CEO at those meetings, and I did not participate in any type of "training" activities at those meetings.

15. I also received calls from the CEO from time to time, who would call me to inquire about how the businesses were doing, and I would update him accordingly. To the best of my recollection, I did not initiate these status calls.

II. **Employment with Thermo in New Hampshire**

16. In 2010, I was promoted to the position of President of the Specialty Diagnostics Group ("Specialty Diagnostics") and relocated to that Group's offices in New Hampshire, where

I became a New Hampshire resident. I was required to relocate to New Hampshire as a condition of the promotion.

17. Specialty Diagnostics did not have any offices or production facilities in Massachusetts, nor did it have any employees in that state, and did not do business in Massachusetts. The Division leaders in Specialty Diagnostics operated out of the United Kingdom, Sweden, Texas, and Virginia, as well as New Hampshire.

18. Specialty Diagnostics also did not utilize the resources of Thermo's Massachusetts office. Information technology services, pricing management, marketing, and payroll were all centralized in Pittsburgh, Pennsylvania. My paystubs from this time period reflect that I was paid out of the Pittsburgh office.

19. As previously discussed, the Complaint is misleading in its allegation that I traveled to Massachusetts for "various meetings and trainings" during my employment. As Group President of Specialty Diagnostics, I was required to travel to Massachusetts to meet with Marc Casper ("Casper"), Thermo's new CEO, and other Group Presidents. To the best of my recollection, I traveled to Massachusetts no more than one day per month. At these meetings, at which Casper was also present, the Group Presidents would discuss the performance of their various groups. Although Casper led the meetings, the meetings were focused largely on the exchange of information between Group Presidents. To the best of my recollection, I did not engage in any form of "training" activities at these meetings.

20. I also received calls from Casper during my tenure in Specialty Diagnostics. These were also in the nature of status calls or business updates about the performance of Specialty Diagnostics. To the best of my recollection, I did not initiate these calls with Casper.

21. In March 2012, I left my employment at Thermo to become CEO of ConvaTec in New Jersey, where I am currently employed. ConvaTec is not competitive with Thermo. Although I was not required to obtain permission from Casper to accept this position, I informed Casper of my decision in advance as a professional courtesy, and received his full approval.

### III. The Non-Competition Agreement

22. At time of the Merger in 2006, I was required to execute a Non-Competition Agreement with Thermo (the "Non-Competition Agreement"), a copy of which is attached to this Declaration as Exhibit A. I received the Non-Competition Agreement in California, where I also executed it.

23. To the best of my knowledge, the Non-Competition Agreement is a form agreement that was used by Fisher Scientific International, Inc. prior to the Merger. It was adopted by Thermo for use subsequent to the Merger. To the best of my knowledge, all executive Thermo employees were required to execute the same form non-competition agreement that I executed in 2006.

24. I was required to execute the Non-Competition Agreement as a condition of my continued employment with Thermo. It was my understanding that I could not have remained employed by Thermo if I had not executed the agreement.

### IV. ConvaTec's Hire of Joe Baiunco

25. After I joined ConvaTec, I was contacted by Joe Baiunco ("Baiunco"), a former colleague at Thermo who worked in Thermo's offices in Pittsburgh, Pennsylvania, expressing interest in a Senior Vice President of Human Resources position at ConvaTec.

26. In response to Baiunco's inquiry, I informed Baiunco that I would not consider his application while he remained employed at Thermo. I did not initiate any contact with

Baiunco regarding the possibility of employment at ConvaTec. Any communications that took place between Baiunco and myself occurred in Pennsylvania and New Jersey, respectively.

27. It is my understanding that Baiunco resigned from Thermo's Pittsburgh office effective May 9, 2012.

28. Baiunco subsequently interviewed for the position of Senior Vice President of Human Resources at ConvaTec. During a competitive screening process, we narrowed the pool of applicants to three candidates for the position. Baiunco was one of two external candidates we considered, along with a very strong internal candidate.

29. ConvaTec interviewed Baiunco in New Jersey on May 18, 2012. After interviewing the other candidates, it was determined that Baiunco was the strongest candidate, and ConvaTec hired Baiunco effective June 1, 2012. Baiunco currently works in ConvaTec's office in Skillman, New Jersey.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 7, 2012

_Kenneth Berger_
Kenneth Berger

# EXHIBIT A

## NONCOMPETITION AGREEMENT

THIS AGREEMENT, dated as of November 9, 2006 is made by and between Kenneth Berger an individual residing at 7347 Spinnaker Street, Carlsbad, CA 92011 (the "Employee"), and Thermo Fisher Scientific Inc., a Delaware corporation whose principal offices are located at 81 Wyman Street, Waltham, Massachusetts 02454 ("Employer").

WHEREAS, Employer, including its subsidiaries and affiliates, is the world leader in the manufacture, development and distribution of scientific and diagnostic instruments, equipment, supplies, workstations and chemicals used by clinical and research laboratories, universities and other life and health sciences customers, as well as diagnostic instruments, test materials and related products for clinical laboratories; and teaching aids for science education. In addition, Employer is a leading supplier of occupational health and safety products and maintenance, repair and operating materials. Employer is also a pioneer in the development of electronic and internet purchasing, marketing and distribution systems.

WHEREAS, Employer has developed and continues to develop and use certain trade secrets, customer lists and other proprietary and confidential information and data, which Employer has spent a substantial amount of time, effort and money, and will continue to do so in the future, to develop or acquire such proprietary and confidential information and to promote and increase its good will.

NOW, THEREFORE, in consideration of Employee's continued employment by Employer or a subsidiary or affiliate thereof, and Employee's compensation, in particular additional valuable consideration including, but not limited to the granting of certain stock options, which is conditioned, at least in part, upon Employee's execution and delivery of this Agreement, Employee understands and agree to the following:

Section 1.   Employee recognizes and acknowledges that it is essential for the proper protection of the Employer's legitimate business interests that Employee be restrained for a reasonable period following the termination of Employee's employment with the Employer, either voluntarily or involuntarily, from competing with Employer as set forth below.

Employee acknowledges and agrees that during the term of Employee's employment with Employer, and for a period of twelve (12) months thereafter, Employee will not, directly or indirectly, engage, participate or invest in or be employed by any business within the Restricted Area, as defined below, which: (i) develops or manufactures products which are competitive with or similar to products developed or manufactured by Employer; (ii) distributes, markets or otherwise sells, either through a direct sales force or through the use of the Internet, products manufactured by others which are competitive with or similar to products distributed, marketed or sold by Employer; or (iii) provide services, including the use of the Internet to sell, market or distribute products, which are competitive with or similar to services provided by Employer, including, in each case, any products or services Employer has under development or which are the subject of active planning at any time during the term of Employee's employment. The foregoing restrictions shall apply regardless of the capacity in which Employee engages,

participates or invests in or is employed by a given business, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise.

"Restricted Area" shall mean each state and territory of the United States of America and each country of the world outside of the United States of America in which Employer had developed, marketed, sold and/or distributed its products and/or services within the last two (2) years of Employee's employment.

Section 2.   During the term of Employee's employment with Employer and for a period of twelve (12) months after termination of the Employee's employment with the Employer for any reason, Employee will not: (i) employ, hire, solicit, induce or identify for employment or attempt to employ, hire, solicit, induce or identify for employment, directly or indirectly, any employee(s) of the Employer to leave his or her employment and become an employee, consultant or representative of any other entity including, but not limited to, Employee's new employer, if any; and/or (ii) solicit, aid in or encourage the solicitation of, contract with, aid in or encourage the contracting with, service, or contact any person or entity which is or was, within the two (2) years prior to Employee's termination of employment with Employer, a customer or client of Employer, for purposes of marketing, offering or selling a product or service competitive with Employer.

Section 3.   For the period of twelve (12) months immediately following the end of Employee's employment by Employer, Employee will inform each new employer, prior to accepting employment, of the existence of this Agreement and provide that employer with a copy of this Agreement.

Section 4.   Employee understands and agrees that the provisions of this section shall not prevent Employee from acquiring or holding publicly traded stock or other publicly traded securities of a business, so long as Employee's ownership does not exceed 1% percent of the outstanding securities of such company of the same class as those held by Employee or from engaging in any activity or having an ownership interest in any business that is reviewed by the Board of Directors of Employer.

Section 5.   Employee acknowledges that the time, geographic and scope of activity limitations set forth herein are reasonable and necessary to protect the Employer's legitimate business interests. However, if in any judicial proceeding a court refuses to enforce this Agreement, whether because the time limitation is too long or because the restrictions contained herein are more extensive (whether as to geographic area, scope of activity or otherwise) than is necessary to protect the legitimate business interests of Employer, it is expressly understood and agreed between the parties hereto that this Agreement is deemed modified to the extent necessary to permit this Agreement to be enforced in any such proceedings.

Section 6.   Employee further acknowledges and agrees that it would be difficult to measure any damages caused to Employer which might result from any breach by Employee of any of the promises set forth in this Agreement, and that, in any event, money damages would be an inadequate remedy for any such breach. Accordingly, Employee acknowledges and agrees that if he or she breaches or threatens to breach, any portion of this Agreement, Employer shall

be entitled, in addition to all other remedies that it may have: (i) to an injunction or other appropriate equitable relief to restrain any such breach without showing or proving any actual damage to Employer; and (ii) to be relieved of any obligation to provide any further payment or benefits to Employee or Employee's dependents.

Section 7. Employee acknowledges and agrees that should it become necessary for Employer to file suit to enforce the covenants contained herein, and any court of competent jurisdiction awards the Employer any damages and/or an injunction due to the acts of Employee, then the Employer shall be entitled to recover its reasonable costs incurred in conducting the suit including, but not limited, reasonable attorneys' fees and expenses.

Section 8. The Employee acknowledges and agrees that this Agreement does not constitute a contract of employment and does not imply that Employer or any of its subsidiaries will continue the Employee's employment for any period of time.

Section 9. This Agreement represents the entire understanding of the parties with respect to the subject matter hereof and any previous agreements or understandings between the parties regarding the subject matter hereof are merged into and superseded by this Agreement.

Section 10. This Agreement cannot be modified, amended or changed, nor may compliance with any provision hereof be waived, except by an instrument in writing executed by the party against whom enforcement of such modification, amendment, change or waiver is sought. Any waiver by a party of the breach of any provision of this Agreement shall not operate or be construed as a waiver of any other breach of such provision or of any breach of any other provision of this Agreement. The failure of a party to insist upon strict compliance with any provision of this Agreement at any time shall not deprive such party of the right to insist upon strict compliance with such provision at any other time or of the right to insist upon strict compliance with any other provision hereof at any time.

Section 11. All notices, requests, demands, consents and other communications which are required or permitted hereunder shall be in writing, and shall be deemed given when actually received or if earlier, two days after deposit with the U.S. postal authorities, certified or registered mail, return receipt requested, postage prepaid or two days after deposit with an internationally recognized air courier or express mail, charges prepaid, addressed as follows:

If to Employer:

> Thermo Fisher Scientific Inc.
> 81 Wyman Street
> Waltham, Massachusetts 02454
> Attention: General Counsel

If to the Employee, at the address set forth above, or to such other address as any party hereto may designate in writing to the other party, specifying a change of address for the purpose of this Agreement.

118707.1

3

Section 12.   This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 13.   This Agreement shall be construed and interpreted in accordance with, and shall be governed exclusively by, the laws of the Commonwealth of Massachusetts and the federal laws of the United States of America. In the event litigation is maintained by a party to this Agreement against any other party to enforce this Agreement or to seek any remedy for breach, then each party hereto shall be responsible for such party's own attorneys' fees and costs of suit.

Section 14.   THE EMPLOYEE ACKNOWLEDGES THAT THE EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT AND HAS HAD ADEQUATE TIME AND OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF THE EMPLOYEE'S OWN CHOOSING REGARDING THE MEANING OF THE TERMS AND CONDITIONS CONTAINED HEREIN, AND THE EMPLOYEE FURTHER ACKNOWLEDGES THAT THE EMPLOYEE FULLY UNDERSTANDS THE CONTENT AND EFFECT OF THIS AGREEMENT AND AGREES TO ALL OF THE PROVISIONS CONTAINED HEREIN.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

EMPLOYEE:

*Kenneth Berger* (signature)
Kenneth Berger

THERMO FISHER SCIENTIFIC INC.

By: _____ (signature)
Stephen G. Sheehan
Title:   Senior Vice President, Human Resources

TMO Corp Admin\D & O ADMIN\Executive Plans\2006 NonCompete Agreements\Berger, Kenneth. - NonCompete Agreement 11.09.06.DOC

118707.1

4