UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————————

THERMO FISHER SCIENTIFIC INC.     )
                                     )
          Plaintiff,          )
                                     )
v.                                 )    Civil Action No. 1:12-cv-11070-RGS
                                   )
KENNETH BERGER               )
                                   )
          Defendant.       )

—————————————————————————

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION TO DISMISS OR TO TRANSFER VENUE

Plaintiff, Thermo Fisher Scientific Inc. ("Thermo Fisher"), submits this memorandum in opposition to the motion of Defendant, Kenneth Berger, to dismiss this action for lack of personal jurisdiction, or, in the alternative, to transfer this action to the District Court for the District of New Jersey.  Thermo Fisher also submits the Declaration of John Piccione ("Piccione Dec.") in support of its opposition to Berger's motion.

## SUMMARY OF POSITION

Thermo Fisher is entitled to bring this action and have it heard in the United States District Court of Massachusetts.  This action concerns claims by a Massachusetts-based company, Thermo Fisher, against one of its former executives, Berger.[1]  Although Berger asserts that he did not have sufficient contacts with Massachusetts for this Court to exercise jurisdiction over him in this matter, his arguments are belied by the uncontested facts.

During his employment with Thermo Fisher, Berger executed a Non-Competition Agreement with Thermo Fisher and then sent that contract by Federal Express to Thermo

---

[1] Thermo Fisher brought the following claims against Berger: Breach of a Non-Competition Agreement (Count I); Breach of Stock Agreements (Count II); Declaratory Judgment (Count III); Breach of Implied Covenant of Good Faith and Fair Dealing (Count IV); and Unjust Enrichment (Count V).

Fisher's headquarters in Massachusetts.  Berger was also issued stock options and restricted stock during his employment with Thermo Fisher.  Certain of those stock options and restricted stock awards were expressly contingent upon Berger's continuing compliance with applicable stock option and restricted stock agreements ("Stock Agreements").  Those Stock Agreements required that Berger maintain a continuous employment relationship with Thermo Fisher in order for the stock options and restricted stock to become vested.  The Stock Agreements also required that Berger comply with the Non-Competition Agreement.  In the twelve months prior to his breach of the Non-Competition Agreement (in or about May 2012), Berger realized approximately $1.5 million in taxable income from the exercise and sale of stock options and the vesting of restricted stock awarded to Berger by Thermo Fisher in connection with his continued employment and pursuant to the Stock Agreements.  In its Complaint, Thermo Fisher alleges that Berger breached the Non-Competition Agreement and Stock Agreements.  Thermo Fisher also contends that Berger was unjustly enriched by his receipt of the stock options and restricted stock, as their issuance was expressly contingent on his continued compliance with the restrictive covenants in the Non-Competition Agreement that he has violated.  Berger's breach of the restrictive covenant necessitates that he forfeit to Thermo Fisher any vested and unexercised stock options and restricted stock he still owns, and that he return to Thermo Fisher the proceeds from the sale of certain stock options and restricted stock.

Berger's business contacts with Massachusetts were substantial during his employment with Thermo Fisher.  For instance, he was responsible for the operations of a multi-million dollar Thermo Fisher subsidiary located in Massachusetts and regularly communicated with individuals located at Thermo Fisher's headquarters in Massachusetts.  Berger also routinely travelled to Massachusetts to attend meetings, participate in training, and keep in contact with Thermo Fisher

personnel.  Moreover, Berger should have anticipated that he could be haled into court in Massachusetts, as the Non-Competition Agreement has a Massachusetts choice of law provision.

Berger's motion should be denied, as he plainly has sufficient contacts with Massachusetts in order for this Court to exercise personal jurisdiction over him.  Likewise, Berger's request for a transfer of this action to the District of New Jersey should be denied, as Thermo Fisher's choice of forum for this action should be given a presumptive preference and Berger is unable to meet his burden to demonstrate that a transfer to the District of New Jersey is warranted.  In sum, Berger's motion should be denied in total.

**<u>RELEVANT FACTUAL BACKGROUND</u>**

## I.   KENNETH BERGER'S EMPLOYMENT WITH THERMO FISHER

Thermo Fisher's principal place of business is in Waltham, Massachusetts. Complaint ¶ 2.  On October 1, 2001, Berger began his employment with Thermo Electron Corporation ("Thermo Electron"), one of Thermo Fisher's predecessors, as President, Real Time Analytics. <u>Id</u>. ¶ 3.  Thermo Electron was also headquartered in Massachusetts. Piccione Dec. ¶ 4.

Prior to March 2010, Berger was required to, as part of his job, and did in fact, travel to Massachusetts approximately once per quarter to participate in meetings with Thermo Fisher's CEO. Declaration of Kenneth Berger ("Berger Dec.") ¶ 14.  Berger acknowledges that he also spoke on the telephone "from time to time" with Thermo Fisher's CEO, who is located in Massachusetts, regarding business matters. <u>Id</u>. ¶ 15.  In March 2010, Berger assumed the role of the President of Thermo Fisher's Specialty Diagnostics Group. Complaint ¶ 6.  In that position, he was required to, and did in fact, increase his travel to Massachusetts to a monthly basis in order to discuss the performance of the various Thermo Fisher business groups, including the groups for which he was responsible. Berger Dec. ¶ 19.  Accordingly, by his own admission,

Berger travelled to Massachusetts more than 50 times during his employment (quarterly for eight years, and monthly for two years). Id. ¶¶ 14 and 19.   Berger also continued to speak on the telephone with Thermo Fisher's CEO in Massachusetts in order to provide the CEO with business updates regarding the performance of the Specialty Diagnostics Group. Id. ¶ 20.   In 2003, Berger participated in two weeks of leadership training with other Thermo Fisher executives at Babson College in Wellesley, Massachusetts. Piccione Dec. ¶ 6.

From March 2010 until April 2011, Berger was responsible in his role as President of the Specialty Diagnostics Group for overseeing Athena Diagnostics Inc. ("Athena"), one of Thermo Fisher's larger subsidiaries located in Massachusetts. Id. ¶ 7.   Berger routinely communicated with the General Manager of Athena, who was located in Massachusetts, and to whom approximately 300 Massachusetts-based Thermo Fisher employees reported. Id.   Berger directly supervised the Athena General Manager and was ultimately responsible for the approximately 300 employees reporting to the General Manager. Id.   Athena was a multi-million dollar business that was operated by Thermo Fisher until April 2011, when it was sold for approximately $740 million. Id.   Athena had gross revenues in 2010 of approximately $110 million. Id.

## II.     BERGER'S NON-COMPETITION AGREEMENT WITH THERMO FISHER

In November 2006, in conjunction with the merger of Thermo Electron and Fisher Scientific International, Inc. ("Fisher Scientific") into Thermo Fisher, Berger entered into a Non-Competition Agreement with Thermo Fisher. Complaint ¶ 9.   Berger hired legal counsel to assist him in reviewing the Non-Competition Agreement. Piccione Dec. ¶ 9. In fact, before Berger signed the Non-Competition Agreement, Berger's counsel sought clarification from Thermo Fisher's counsel in Massachusetts regarding various issues, including whether Berger's receipt of 55,500 stock options was contingent upon him signing the Non-Competition Agreement. Id.

Thermo Fisher confirmed that Berger's receipt of such stock options was, in fact, contingent upon him signing the Non-Competition Agreement. Id.  Berger's legal bills in connection with the Non-Competition Agreement, for which Thermo Fisher reimbursed Berger $7,040, indicate that his counsel researched the enforceability of non-competition agreements in Massachusetts. Id. ¶ 10.  Although Berger's counsel advised Thermo Fisher that Berger would not sign the Non-Competition Agreement, Berger apparently reconsidered and signed. Id. ¶ 9.  Berger sent the signed Non-Competition Agreement to Thermo Fisher's headquarters in Massachusetts. Id. ¶ 8.

In consideration for entering into the Non-Competition Agreement, Thermo Fisher continued to employ Berger and granted him 55,500 stock options, pursuant to a Stock Agreement. Complaint ¶ 10.  Thermo Fisher entered into the Non-Competition Agreement in exchange for Berger's promises as set forth in that Non-Competition Agreement, including his agreement to abide by certain restrictive covenants. Id.  As Berger acknowledges, his continued employment with Thermo Fisher was contingent on his execution of and compliance with the Non-Competition Agreement. Berger Dec. ¶ 24.  One of the provisions in the Non-Competition Agreement proscribes Berger from employing, soliciting, hiring, inducing or identifying for employment, directly or indirectly, any Thermo Fisher employee to leave his or her employment with Thermo Fisher and become employed by any other entity, including Berger's new employer.  Berger agreed to abide by this restriction "for a period of twelve (12) months" following the end of his employment. Complaint ¶ 11.  The Non-Competition Agreement also includes a Massachusetts choice of law provision. Berger Dec., Exhibit A.

## III.    BERGER'S STOCK AGREEMENTS WITH THERMO FISHER

At various points during his employment, Thermo Fisher issued Berger stock options and restricted stock pursuant to written agreements (the "Stock Agreements"). Complaint ¶ 14.

Copies of the Stock Agreements are attached to the Piccione Dec. as Exhibit C.  In total, in the twelve months prior to Berger's breach of the Non-Competition Agreement, Berger realized more than $1.5 million in taxable income from the exercise and sale of the stock options and the vesting of restricted stock awarded to him by Thermo Fisher.[2]  Complaint ¶ 14.  When Berger accepted these stock options and the restricted stock from Thermo Fisher, he understood that it was contingent upon his continued compliance with the conditions set forth in the Stock Agreements. Id. ¶ 15.

Each of the Stock Agreements includes a requirement that Berger comply with the restrictive covenants in the Non-Competition Agreement. Id. ¶¶ 15-19.  In the event of a breach of the Stock Agreements by Berger that occurred after Berger had already exercised certain stock options and sold his shares, or had already sold restricted stock, then he could be obligated to pay back to Thermo Fisher the proceeds from the sale of those shares. Id. ¶¶ 17-19.  The Stock Agreements also include a requirement that Berger remain employed with Thermo Fisher in order to either exercise his stock options or for his restricted stock to vest for his benefit.  With respect to the stock options, Berger needed to exercise such options within three months after his employment ended. Piccione Dec., Exhibit C (Sections 3(b) and (c) of stock option agreements).  The Stock Agreements pertaining to restricted stock include a similar provision requiring continued employment by Berger with Thermo Fisher in order for the restricted stock to vest. Id.,

---

[2] On March 5, 2012 (Berger's last day of employment with Thermo Fisher), Berger exercised 65,275 stock options and realized taxable income of $659,505.59, and received 2,300 shares of restricted stock for which he realized $130,088 in taxable income. Piccione Dec. ¶ 12.  On March 5, 2010, Thermo Fisher had awarded Berger 46,400 stock options and 6,900 restricted stock units. Id.  Pursuant to the respective vesting schedules set forth in the Stock Agreements, a portion of them could be exercised (1/4 annually for stock options) or vested (1/3 annually for restricted stock) on an annual basis thereafter. Id., Exhibit C.  Accordingly, on March 5, 2012, 11,600 stock options and 2,300 restricted stock units from these March 5, 2010 grants became available to Berger to "cash out" for the first time, as he had remained continuously employed by Thermo Fisher and appeared to have otherwise complied with the Stock Agreements to that date. Id.  Berger also exercised 30,300 stock options in April 2011 (realizing $708,390), 2,300 restricted stock units on March 5, 2011 (realizing $131,146), 25 restricted stock units on May 20, 2011 (realizing $1,629.50), and 145 restricted stock units on February 23, 2011 (realizing $8,137.40). Id.

Exhibit C (Sections 2 and 3(a) of restricted stock agreements).  Except in certain circumstances that do not apply here, once Berger's employment ended, any unvested restricted stock was "immediately forfeited" to Thermo Fisher. Id.

## IV.     BERGER'S BREACH OF THE NON-COMPETITION AGREEMENT

On or about March 5, 2012, Berger voluntarily resigned from his employment at Thermo Fisher in order to become CEO of ConvaTec, Inc. Berger Dec. ¶ 21; Complaint ¶ 2. Approximately one month after Berger's voluntary resignation, Thermo Fisher's Vice President of Human Resources for the Laboratory Products Group, Joseph A. Baiunco, informed his supervisor in Massachusetts that he planned on joining Berger at ConvaTec. Complaint ¶ 21; Piccione Dec. ¶ 15.  At that time, Mr. Biaunco's supervisor reminded Mr. Baiunco that Berger was not able to hire Thermo Fisher employees for one year following the end of Berger's employment. Complaint ¶ 21.    Mr. Baiunco asked Thermo Fisher to "waive" Berger's prohibition against hiring Thermo Fisher employees, but Thermo Fisher denied that request. Id. Thereafter, Mr. Baiunco submitted his resignation, effective May 9, 2012. Complaint ¶ 22.  Just nine days later, on May 18, 2012, Mr. Baiunco interviewed for a position with Convatec. Declaration of Joseph Baiunco ¶ 13.  Mr. Baiunco was hired by Convatec, effective June 1, 2012, as Convatec's Senior Vice President of Human Resources. Baiunco Dec. ¶ 14.

## ARGUMENT

## I.     This Court Has Personal Jurisdiction Over Berger

Since this is a case brought pursuant to the diversity jurisdiction statute, 28 U.S.C. 1332, this Court has jurisdiction only if a Massachusetts state court would have jurisdiction over this matter. Shipley Co. Inc. v. Clark, 728 F. Supp. 818, 821 (D.Mass. 1990).  Accordingly, Thermo Fisher must show that the Massachusetts long-arm statute grants jurisdiction over Berger and

that the exercise of that jurisdiction comports with the due process clause of the Fifth Amendment. See Adelson v. Hananel, 652 F.3d 75, 80 (1st Cir. 2011).  The Massachusetts long-arm statute is coextensive with the limits permitted by the U.S. Constitution and, therefore, this Court can turn directly to the constitutional test for the determination of personal jurisdiction over Berger. See Adelson, 652 F.3d at 80, citing Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 52 (1st Cir. 2002).  Notably, the specific facts alleged by Thermo Fisher, as the Plaintiff in this matter, are assumed to be true and construed in the light most favorable to Thermo Fisher for purposes of determining personal jurisdiction. See Cepeda v. Kass, 62 Mass. App. Ct. 732, 737-38 (2004); Edwards v. Radventures, Inc., 164 F. Supp. 2d 190, 192 (D.Mass. 2001) (court should accept properly supported proffers of evidence by plaintiff as true).  This Court has jurisdiction over Berger due to his substantial contacts with Massachusetts.

## A.    Berger's Massachusetts Contacts Satisfy The Long-Arm Statute

This Court's exercise of personal jurisdiction over Berger is authorized by the Massachusetts long-arm statute, G.L. c.223A, § 3, which states in relevant part that "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth . . . ."  This provision is to be "construed broadly," such that even incidental commercial contact with Massachusetts relating to a cause of action can be sufficient to confer personal jurisdiction. See Shipley, 728 F. Supp. at 821, citing Nova Biomedical Corp. v. Moller, 629 F.2d 190, 193-94 (1st Cir. 1980); see also Boudreau v. Scitex Corp. Ltd., 1992 U.S. Dist LEXIS 9629 at *5 (D.Mass. June 25, 1992) (Young, J.) ("section 3(a) is broadly interpreted and easily satisfied"). Here, there is no doubt that Berger conducted substantial business in Massachusetts, let alone the merely incidental amount of business that is required to satisfy the

long-arm statute.  Further, all of the business conducted by Berger in Massachusetts stems from his employment with Thermo Fisher and, therefore, is connected to the claims at issue here.

The First Circuit has held that as little contact as mailing four letters and participating in a single phone call with Massachusetts is sufficient to meet the "transacting business" requirement in Section 3(a) of the Massachusetts long-arm statute. Shipley, 728 F. Supp. at 821, citing Bond Leather Col, Inc. v. Q.T. Shoe Mfg. Co., Inc., 764 F.2d 928, 932 (1st Cir. 1985) (defendant, a guarantor of another out-of-state's company's debt with a Massachusetts company, that mailed four letters to Massachusetts company and received one phone call from Massachusetts company was "within the reach" of Section 3(a)); see also JMTR Enters., LLC v. Duchin, 42 F. Supp. 2d 87, 95-96 (D. Mass 1999) (defendant "transacted business" based on several letters, two telephone calls and an agent visit).  Indeed, in a breach of an employment contract action such as here, it is sufficient for the defendant's Massachusetts contacts to consist of merely mailing the contract to the forum state and visiting the forum state to meet the jurisdictional requirements of Section 3(a) of the Massachusetts long-arm statute. Shipley, 728 F. Supp. at 821-22.

Berger cites to only a single case to support his contention that his Massachusetts contacts do not satisfy the Massachusetts long-arm statute, Lyle Richards Int'l, Ltd. v. Ashworth, Inc., 132 F.3d 111 (1st Cir. 1997).  Notably, this case concerns an agreement between two corporate entities, rather than a contract between an employer and its employee. Id.  Further, when the corporate entities in the Lyle Richards matter formed their agreement, the out-of-state defendant company had no expected or actual contractual responsibilities in Massachusetts. Id. at 112.  The only time a representative of the defendant company travelled to Massachusetts was to attend three trade shows, which it unilaterally decided to attend and were unrelated to its contractual relationship with the plaintiff company. Id. at 114.  The court in the Lyle Richards

matter merely determined that the defendant's attendance at these three trade shows in Massachusetts was "incidental" and extraneous to the formation of the contract and did not constitute a "but for" cause for the alleged breach of the contract. Id. The facts in Lyle Richards are hardly comparable to the facts at issue in this matter.

In contrast, Berger had a continuing employment relationship with Thermo Fisher, which was only possible due to his signing of the Non-Competition Agreement, which he subsequently mailed to Massachusetts. See Berger Dec. ¶ 14. Further, Berger realized proceeds of more than $1.5 million from stock options and restricted stock pursuant to the Stock Agreements. Those stock options and the restricted stock were contingent on his continued employment with Thermo Fisher. Notably, Berger received 55,500 stock options pursuant to a Stock Agreement when he signed the Non-Competition Agreement. Given Berger's employment responsibilities with Thermo Fisher, which required that he oversee a multi-million dollar Thermo Fisher subsidiary located in Massachusetts (Athena) with approximately 300 employees that indirectly reported to him, regularly travel more than 50 times to Massachusetts for business meetings (first quarterly for eight years, then monthly for two years), routinely speak to Athena's General Manager and Thermo Fisher's CEO in Massachusetts, and attend a two-week leadership training program in Massachusetts, it is evident that Berger's entry into and compliance with the Non-Competition Agreement and Stock Agreements (the subjects of this action) would necessitate that he regularly conduct business in Massachusetts.[3] In short, the Lyle Richards case cited by

---

[3] In his Declaration, Berger conveniently fails to even mention his substantial responsibilities overseeing a multi-million dollar business, Athena, located in Massachusetts. Berger also states in his Declaration that "[t]o the best of [his] recollection," he "did not participate in any 'training' activities at" meetings he attended in Massachusetts. Berger Dec. ¶ 14. His failure to recall the extensive two weeks of training he attended in Massachusetts is dubious. Berger's exclusion of these significant business contacts with Massachusetts is plainly a misguided attempt to minimize his contacts with Massachusetts and is, at a minimum, misleading, if not outright deceptive. In any event, to the extent there are contested facts at issue in connection with the Court's jurisdictional analysis, this Court should accept Thermo Fisher's facts as true. See Rissman Hendricks & Oliverio, LLP v. MIV Therapeutics, Inc.,

Berger fails to support his contention that this Court lacks the authority to exercise personal jurisdiction over him, as Berger's substantial contacts with Massachusetts were not merely "incidental" or "extraneous" to his contracts with Thermo Fisher.  Moreover, unlike in <u>Lyle Richards</u>, Thermo Fisher has an unjust enrichment claim against Berger based on the stock options and restricted stock he was provided.[4]  Berger's ability to financially benefit from those stock options and restricted stock was dependent upon his continued employment with Thermo Fisher and his ongoing compliance with the Stock Agreements, including specifically the restrictive covenants set forth in the Non-Competition Agreement.

The facts at issue here more closely resemble the facts in <u>Shipley Co. Inc. v. Clark</u>. 728 F. Supp. 818.  In <u>Shipley</u>, this Court found that it could exercise jurisdiction over two former employees of the plaintiff-company, who were accused of violating a non-compete agreement. <u>Id</u>.  Like Berger, the former employees in <u>Shipley</u> worked for a Massachusetts-based employer, but were stationed elsewhere (in their case Michigan). <u>Id</u>.  This Court found that the former employees' mailing of their contracts and making "some visits" to Massachusetts in order to consult with their former employer's personnel, qualified as "transacting business" for purposes of Section 3(a). 728 F. Supp. at 821-22.  In particular, simply mailing their contracts, which were the subject of the underlying cause of action, to Massachusetts, was sufficient to show that the cause of action for breach of contract arose from the business transacted. <u>Id</u>. at 822.  In sum, it is indisputable that Berger's substantial business contacts with Massachusetts as a result of his

---

2012 U.S. Dist. LEXIS 140066 at *4 (Wolf, J.) (D.Mass.) (Sept. 28, 2012) (court "adduces 'the facts from the pleadings and the parties' supplementary filings, including affidavits, taking the facts affirmatively alleged by plaintiff as true and construing disputed facts in the light most hospitable to plaintiff.'"), quoting <u>Ticketmaster-New York, Inc. v. Aliota</u>, 26 F.3d 201, 203 (1st Cir. 1994) (additional citations omitted).

[4] In his Motion, Berger exclusively focuses upon his breach of the Non-Competition Agreement.  However, Thermo Fisher also filed claims against Berger for breach of the Stock Agreements, declaratory judgment, unjust enrichment and breach of the covenant of good faith and fair dealing.  This Court's exercise of personal jurisdiction over Berger must be considered in light of all of Thermo Fisher's claims.

employment with Thermo Fisher were more than sufficient to meet the minimal jurisdictional requirements of Section 3(a) of the Massachusetts long-arm statute.

**B.**    **This Court's Exercise Of Personal Jurisdiction Comports with Due Process**

The constitutional analysis, by which a court determines whether a party has "minimal contacts" with a particular jurisdiction sufficient to satisfy the requirements of due process, has three components: (1) relatedness, (2) purposeful availment, and (3) reasonableness. Adelson, 652 F.3d at 80.  Essentially, the "minimal contacts" requirement ensures that a defendant has been given "fair warning" that a particular activity could subject that party to defend a claim in a particular jurisdiction. Boudreau, 1992 U.S. Dist. LEXIS 9629 at *8, citing Burger King v. Rudzewicz, 471 U.S. 462, 476 (1985).  Here, all of the factors to be reviewed in connection with the constitutional analysis support this Court's exercise of personal jurisdiction over Berger. Indeed, Berger was given more than "fair warning" that an action could be filed against him in Massachusetts by Thermo Fisher, his employer of more than 10 years (including his time employed by Thermo Electron) and a Massachusetts-based company.

**1.**    **Relatedness**

The relatedness factor requires a "demonstrable nexus" between the claim and the defendant's forum-based activities. Hannon v. Beard, 524 F.3d 275, 280 (1st Cir. 2008) (additional citations omitted).  The standard in determining whether such a nexus exists between the plaintiff's claim and the defendant's contacts with the forum state is a "flexible, relaxed" standard. Optos, Inc. v. Topcon Medical Systems, Inc., 777 F. Supp. 2d 217, 227 (D. Mass. 2011), quoting Pesmel N. Am., LLC v. Caraustar Indus., Inc., 754 F. Supp. 2d 168 (D. Mass. 2010), quoting in turn Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 9 (1st Cir. 2009). In breach of contract actions, courts consider whether the defendant's forum-based activity "in

the forum state was instrumental in the formation of the contract or its breach." See Adelson, 652 F.3d at 81, quoting Adams v. Adams, 601 F.3d 1, 6 (1st Cir. 2010) (additional citations omitted). In addition, relatedness can also be shown if Berger was "subject to substantial control and ongoing connection to [Massachusetts] in the performance of the contract." See id.

Here, Berger's contacts with Massachusetts in fact were "instrumental" in the formation of the Non-Competition Agreement, as he mailed the executed Non-Competition Agreement to Massachusetts. See Shipley, 728 F. Supp. at 822 (finding that defendants' mailing to Massachusetts of employment contracts, which were subject of claim, sufficient to place defendants on notice of possibility of suit in Massachusetts).  The Shipley case is again instructive, as the court found that jurisdiction was conferred on the defendants even though they worked out of state, because they were employed by a Massachusetts company, the contract at issue contained a Massachusetts choice of law provision (but no choice of venue clause), and the defendants' visits to Massachusetts were in furtherance of the employment contract with their employer. Id.  In determining whether the court could exercise personal jurisdiction over the defendants in the Shipley case, the court aptly stated "[i]ndeed, the sole purpose of [the defendants'] employment was to generate revenue for a Massachusetts company." Id.  As described above, the facts at issue here neatly parallel those at issue in Shipley.  Indeed, Thermo Fisher is a Massachusetts-based company with whom Berger signed the Non-Competition Agreement that contained a Massachusetts choice of law provision.  Further, Berger's visits to, communications with and responsibilities of oversight in, Massachusetts, were in furtherance of Berger's employment with Thermo Fisher, which would have ended had he not signed the Non-Competition Agreement.  Moreover, the sole purpose of Berger's employment with Thermo Fisher (as with the defendants in Shipley) was to generate revenue for a Massachusetts company.

In another instructive case, the First Circuit held that the United States District Court in Massachusetts properly exercised personal jurisdiction over an out-of-state defendant who formed a contract in Israel with a Massachusetts-based company. Adelson v. Moshe Hananel, 652 F.3d 75.   The First Circuit held that the relatedness factor was satisfied based on the defendant's contacts with Massachusetts in fulfillment of his contract, including attendance of a board meeting, periodic calls, and monthly fax transmissions. Id. at 79-82.   Berger's contacts with Massachusetts were substantially more significant than those at issue in the Adelson matter. See Section I.A, describing Berger's Massachusetts-based responsibilities.

Finally, it cannot be overstated that Berger was greatly enriched as a result of his continuing employment with Thermo Fisher and pursuant to his Stock Agreements with Thermo Fisher.  If Berger had left his employment with Thermo Fisher, then he would have forfeited some portion of the $1.5 million he realized in proceeds from stock options and restricted stock (depending on the date his employment ended).[5]  Instead, Berger chose to remain employed with Thermo Fisher and continue to perform his Massachusetts-related responsibilities.   Indeed, Berger was only allowed to continue his employment with Thermo Fisher because he signed the Non-Competition Agreement.[6]   The Stock Agreements and Non-Competition Agreement are inextricably intertwined, as Berger received 55,500 stock options pursuant to a Stock Agreement for signing the Non-Competition Agreement.  Further, Berger's breach of the Non-Competition Agreement requires Berger to forfeit and/or pay back a portion of the proceeds he received from

---

[5] If Berger had left his employment prior to March 5, 2012, he would have forfeited at least 2,300 restricted stock units, worth approximately $130,088. See supra note 2.

[6] Berger made the decision to sign the Non-Competition Agreement after consulting with counsel, who researched the enforceability of the agreement in Massachusetts and communicated with Thermo Fisher's counsel in Massachusetts regarding the terms of the Non-Competition Agreement. See Boudreau, 1992 U.S. Dist. LEXIS 96269 at *10 (negotiations of employment contract via telephone calls, fax and e-mail between Israel and Massachusetts sufficient to satisfy minimum contacts requirement).

the Stock Agreements.  This forfeiture, under theories of breach of contract, breach of the duty of

good faith and fair dealing and unjust enrichment, is central to this dispute.  In sum, it cannot be

disputed that Berger's employment with and compensation from Thermo Fisher were directly

tied to the Non-Competition Agreement and Stock Agreements that are the subject of this action.

Accordingly, Berger's contacts with Massachusetts are plainly more than sufficient to satisfy the

"flexible, relaxed" relatedness prong of the "minimal contacts" personal jurisdiction analysis.

### 2.       Purposeful Availment

The second factor to be considered consists of a determination whether Berger's contacts

"represent a purposeful availment of the privilege of conducting activities in Massachusetts,

thereby invoking the benefits and protections of Massachusetts's laws and making his presence

before Massachusetts courts foreseeable." Adelson, 652 F.3d at 82, quoting Daynard, 290 F.3d at

60.  Here, Berger participated in economic activities in Massachusetts, such that he should have

reasonably anticipated being haled into court here. See Shipley, 728 F. Supp. at 822 (defendants'

work for Massachusetts company, Massachusetts choice of law provision in contract, visits to

Massachusetts, and receipt of salary from Massachusetts employer, provided notice to

defendants of potential suit in Massachusetts).  All of the facts in this matter indicate that Berger

was aware that he may be called into court in this jurisdiction.

To begin with, Berger sent the signed Non-Competition Agreement via Federal Express

to Massachusetts. Piccione Dec. ¶ 8.   Further, Berger was employed by a Massachusetts

employer, to which he frequently travelled for business and for which he managed a multi-

million dollar business located in Massachusetts. Id. ¶¶ 4-7.  By signing the Non-Competition

Agreement, which contains a Massachusetts choice of law provision, Berger purposefully

availed himself of the benefits and protections of Massachusetts laws, thereby reinforcing his

deliberate affiliation with Massachusetts and rendering it reasonably foreseeable that he would be involved in litigation in Massachusetts. See Burger King, 471 U.S. at 482 (Florida courts have personal jurisdiction over defendants, in part because defendants purposefully availed themselves of the benefits and protections of Florida law by entering agreement with Florida choice of law provision).  Finally, Berger's continued employment with Thermo Fisher resulted in him realizing approximately $1.5 million in taxable income from his exercise and the vesting of stock options and restricted stock awarded to him by Thermo Fisher.  Based on the foregoing facts and precedent, there can be no dispute that Berger purposefully availed himself of the protections and benefits of Massachusetts, such that he could foresee the possibility of defending a suit in Massachusetts.

### 3.      Reasonableness

In circumstances such as exist here, where the relatedness and purposeful availment factors weigh heavily in favor of the exercise of personal jurisdiction, the weight of the reasonableness factor is only "slight." See Adelson, 652 F.3d at 84, citing Sawtelle v. Farrell, 70 F.3d 1381, 1394 (1st Cir. 1995).  That said, courts look to the so-called "gestalt factors" when analyzing reasonableness.  Those factors include the following in this instance:  (1) Berger's burden of appearing in this Court; (2) Massachusetts's interest in adjudicating the dispute, (3) Thermo Fisher's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. See Adelson, 652 F.3d at 83. Notwithstanding the already demonstrated relatedness and purposeful availment factors, these "gestalt factors" further support this Court's valid exercise of personal jurisdiction over Berger.

For instance, Berger's burden of appearing in this court is minimal.  He certainly cannot show a "special or unusual burden" in defending the claims against him in Massachusetts, as he must in order for this factor to support dismissal. Id.  Berger still lives in New Hampshire and travels between New Hampshire and New Jersey on a weekly basis. Berger Dec. ¶ 3.  In order to do so (unless he takes an unreasonably circuitous route), Berger must also travel through Massachusetts on a weekly basis.  Further, there is no reason why this Court cannot effectively resolve this dispute.  There are no related claims pending in other jurisdictions, the consolidation of which may constitute a more efficient resolution.  Indeed, this is the only action pending in any court regarding the subject matter of this dispute.  Moreover, this Court is better suited to interpret and apply Massachusetts law than a court sitting in another state.  Finally, there are no social policies at stake which would encourage a dismissal of this matter due to a lack of personal jurisdiction over Berger.  In sum, the "gestalt factors" concerning the reasonableness of this Court's exercise of personal jurisdiction over Berger all suggest that such exercise is reasonable.  This is particularly true because the factors of "relatedness" and "purposeful availment" already weigh heavily in favor of exercising personal jurisdiction over Berger.

## II.   Transfer Of This Action Is Not Warranted

In his motion, Berger requests that in the alternative to dismissing the action, this Court transfer the action to the District of New Jersey pursuant to 28 USC § 1404(a).[7]  Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  Although the Court

---

[7] Berger actually requests a transfer of venue in his motion pursuant to 28 U.S.C. § 1406, however, he argues in his memorandum supporting the motion for a transfer pursuant to 28 U.S.C. § 1404(a).  A transfer of venue pursuant to 28 U.S.C. § 1406 would only be proper in cases where venue is improper in the initial forum.  As Berger apparently recognizes, venue is proper in the District of Massachusetts in this case so Section 1406 does not apply.

has discretion to transfer a case pursuant to Section 1404, there is "a presumption in favor of the plaintiff's choice of forum" and "the burden of proving that a transfer is warranted rests with the defendant." <u>Workgroup Tech. Corp. v MGM Grand Hotel, LLC</u>, 246 F. Supp. 2d 102, 116 (D.Mass. 2003) (additional citation omitted).  In fact, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." <u>Buckley v. McGraw-Hill, Inc.</u>, 762 F. Supp. 430, 439 (D.N.H. 1991), quoting <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 508 (1947).  As stated by the First Circuit, quoting from the Supreme Court:

> [The plaintiff] should not be deprived of the presumed advantages of his home jurisdiction except upon a clear showing of facts which either (1) establishes such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) to make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative or legal problems.

<u>Nowak v. Tak How Invs., Ltd.</u>, 94 F.3d 708, 719 (1st Cir. 1996), quoting <u>Koster v. Lumbermans Mut. Cas. Co.</u>, 330 U.S. 518, 524 (1947); <u>see also</u> <u>Reebok Int'l v. Dunkadelic, Inc.</u>, 2004 U.S. Dist. LEXIS 3167 (D.Mass. March 2, 2004) (transfer of venue inappropriate when merely shifts inconvenience from one party to another).

        In general, courts consider the following factors when analyzing a motion pursuant to 28 U.S.C. § 1404(a): (1) the convenience of the parties, (2) the convenience of the witnesses, (3) the relative ease of access to sources of proof, (4) the availability of process to compel attendance of unwilling witnesses, (5) cost of obtaining willing witnesses, and (6) any practical problems associated with trying the case most expeditiously and inexpensively. <u>See</u> <u>Optos</u>, 777 F. Supp. 2d at 237.  None of these factors indicate that a transfer of this matter is warranted, let alone undermine the strong presumption in favor of Thermo Fisher's choice of forum in this Court.

        The first factor to be considered is the convenience of the parties.  Thermo Fisher's headquarters are located in Massachusetts and several of its employees who are likely to be

- 18 -

witnesses in this action on behalf of Thermo Fisher reside in Massachusetts. Piccione Dec. ¶ 13. Although Berger is not a resident of Massachusetts, he would not be significantly inconvenienced by adjudicating this matter in Massachusetts.  Indeed, Berger resides in New Hampshire and travels between New Hampshire and New Jersey on a weekly basis. Berger Dec. ¶¶ 3 and 16.  Accordingly, Berger almost assuredly also travels through Massachusetts twice weekly as well.  Under these circumstances, Berger's assertion that he would be "unduly burdened" if this matter is adjudicated in a Massachusetts venue is hardly credible.

With respect to the convenience of witnesses, Berger has identified only one witness, besides himself, whom he claims will be inconvenienced by traveling to Massachusetts.  That witness is a ConvaTec employee, Joseph Baiunco.  Even assuming that the Massachusetts venue for this action would be inconvenient for Mr. Baiunco, there are at least three witnesses located in Massachusetts for whom travelling to New Jersey would be at least equally inconvenient. Piccione Dec. ¶¶ 13-17.  Those witnesses may testify regarding critical issues in this matter, including but not limited to Berger's Non-Competition Agreement, the Stock Agreements, Baiunco's plans to work for Convatec while still employed by Thermo Fisher, and Berger's work responsibilities. Id.  By transferring this matter to New Jersey, this Court would simply be transferring the potential inconvenience from one witness to other witnesses.  In fact, there would be more witnesses potentially inconvenienced by a transfer of this matter to New Jersey, than would be potentially inconvenienced by the adjudication of this matter in Massachusetts.

Further, Berger has not identified any obstacles to trying this case in Massachusetts.  In fact, the Non-Competition Agreement requires the application of Massachusetts law and this Court is best suited to apply that law, as it has more experience applying Massachusetts law than courts in New Jersey.  While Berger argues that the operative facts in this matter "have no

material connection to Massachusetts," he neglects to acknowledge that Thermo Fisher signed the Non-Competition Agreement in Massachusetts and Berger sent it to Massachusetts. Piccione Dec. ¶ 8.    Berger's employment with Thermo Fisher was also intertwined with his responsibilities and the benefits he received under the Non-Competition Agreement and Stock Agreements.   Moreover, the damages resulting from Berger's breach of the Non-Competition Agreement are felt in Massachusetts, where Thermo Fisher is headquartered.   Massachusetts has a distinct interest in adjudicating this action because the action affects a corporation residing and operating in Massachusetts. See Next Generation Vending v. Bruno, 2008 Mass. Super LEXIS 348 at *9 (Quinlan, J.) (May 20, 2008) ("Massachusetts has a strong interest in enforcing agreements made by its employees and businesses."), citing Shipley, 728 F. Supp. at 826.

Given the above, a transfer of this matter from this Court to the District of New Jersey would not be proper.   The sole purpose of such a transfer would merely be to convenience Berger, or more accurately a non-party Mr. Baiunco, at the expense of Thermo Fisher and other witnesses.   Mere convenience of a party is not sufficient, however, to warrant the transfer of an action to another jurisdiction. Buckley, 762 F. Supp. at 439; see also Reebok Int'l, 2004 U.S. Dist. LEXIS 3167.   The strong presumption in favor of Thermo Fisher's choice of forum in this Court should not be undermined by Berger's request to transfer this action to the District of New Jersey.   Accordingly, Berger's request should be denied.

## CONCLUSION

For all of the above reasons, Berger's Motion to Dismiss Or, In The Alternative, To Transfer Venue, should be denied.

Respectfully submitted,

THERMO FISHER SCIENTIFIC INC.,
By its attorneys,


/s/ Allan N. MacLean
Erik J. Winton, BBO #600743
wintone@jacksonlewis.com
Allan N. MacLean, BBO #664396
macleana@jacksonlewis.com
JACKSON LEWIS LLP
75 Park Plaza
Boston, MA  02116
(617) 367-0025

Dated:  October 12, 2012



## CERTIFICATE OF SERVICE

This hereby certifies that on this 12th day of October 2012, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Allan N. MacLean
Jackson Lewis LLP


4852-3353-5505, v.  8